THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

BETH ANN BEKELESKI,

                                  OPINION AND ORDER

       Plaintiff,

                                  19-cv-475–bbc

ANDREW SAUL, COMMISSIONER
OF SOCIAL SECURITY,

       Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Plaintiff Beth Ann Bekeleski is seeking review of a final administrative decision of the Commissioner of Social Security, denying her claim for disability insurance benefits under the Social Security Act. 42 U.S.C. § 405(g). Plaintiff contends that she is disabled because of fibromyalgia, chronic fatigue syndrome, arthritis, depression, obesity, club feet, bilateral cavovarus foot deformity and Charcot-Marie-Tooth, which refers to a group of inherited disorders that can cause nerve damage.

At the time plaintiff applied for benefits, she was 27 and employed half-time at a bank. The administrative law judge hearing her case concluded that plaintiff could not perform her past relevant work, but could perform a range of jobs that existed in substantial numbers in the national economy, not including jobs that required such things as working around hazards or climbing stairs, etc. AR 5. She also found that plaintiff had some mental impairments, but they had no effect on her functional abilities. Id.

1

Plaintiff sought review of the decision from the Appeals Council, which found that the administrative law judge had erred in one respect (finding that plaintiff had engaged in substantial gainful activity in 2014 and 2016), but had otherwise reached a correct decision when it found plaintiff capable of performing the full range of the sedentary level of work. Plaintiff then brought this action, contending that the law judge made more errors than the Appeal Council recognized, specifically: (1) failing to give sufficient weight to the opinions of plaintiff's treating physician; (2) providing flawed credibility findings; and (3) failing to properly assess listing 1.02A, relating to major dysfunction of a joint. For the reasons that follow, I conclude that the council reached the correct conclusion.

The following facts are drawn from the administrative record (AR).

## FACTS

### A. Plaintiff's Social Security Application and Background

Plaintiff was born on December 13, 1988 and was 24 on her alleged disability onset date of October 1, 2013. She applied for social security benefits, but her claim was denied initially and again upon reconsideration on December 1, 2015. She filed a timely request for a hearing, which was held by an administrative law judge on January 23, 2018. Her claim was denied on August 16, 2019. Plaintiff then sought review of the decision from the Appeals Council, which concluded that the administrative law judge had erred in finding that plaintiff had engaged in substantial gainful activity in the periods January 1, 2014 to December 31, 2014 and January 1, 2016 to December 31, 2016. The council adopted the

remainder of the administrative law judge's findings and conclusions. The commissioner does not take issue with the council's decision, so I will follow his lead and consider only the findings and conclusions that relate to steps two through five of the evaluation process.

B. Plaintiff's Medical Record

1. Dr. Craig Sullivan

Plaintiff was born with club feet and has undergone surgeries for the condition. In June 2013, she started seeing Craig Sullivan, a doctor of podiatric medicine, complaining of foot pain after she had walked for two miles. AR 329. The doctor recommended a Cam walker (a boot with controlled ankle motion), switching to biking in place of walking, which continued to be difficult for her, and continued swimming. AR 330. Plaintiff saw Dr. Sullivan in July and September 2013, still complaining of pain in her left foot. AR 327. In October, the doctor encouraged plaintiff to use a knee roller in an effort to reduce the weight she was putting on her foot. (A knee roller has handlebars and a flat, wheeled surface on which a person may rest her knee or foot.) AR 326.

In November 2013, Dr. Sullivan recommended that plaintiff continue to use the knee roller while she was at work and gradually increase walking in a regular shoe when she was at home. AR 325. In December 2013, she was still having pain in her feet, but having modest success in walking. She continued to use either a knee roller or a Cam boot at work, but Dr. Sullivan was trying to get her walking and suggested that she go to physical therapy. Plaintiff claimed she had financial constraints. AR 324-25. In May 2014, Dr. Sullivan

reported making some changes in plaintiff's orthotics and planned to get plaintiff a handicap parking permit. AR 322.

2. Mayo Clinic

Plaintiff began experiencing pain throughout her body in 2014. In March 2015, she had a fibromyalgia and chronic fatigue syndrome evaluation at the Mayo Clinic in Rochester, Minnesota. AR 354. She described increasing fatigue during the year and her examination showed 17/18 tender points. The doctors diagnosed fibromyalgia, chronic multifactorial fatigue, insomnia, anxiety/depression, deconditioning, Charcot-Marie-Tooth, type 1, hypothyroidism and headaches. AR 353. The clinic recommended a number of approaches to help plaintiff feel better, including stress management, energy conservation and graded exercise, and it referred her to occupational therapy in Prairie du Chien for relief from the pain she was experiencing. AR 377.

Plaintiff met with an occupational therapist in Prairie du Chien on April 16, 2015. AR 445. The therapist set up a plan under which plaintiff would report twice a week for an aquatic program and engage in therapeutic exercise, manual therapy, education in a home program and activities of daily living, with modifications if necessary. The goal was decreased pain and edema, more activity, the ability to walk at least six blocks, and the development of a home exercise program. Id. Plaintiff showed up for the first four sessions of water exercise, but did not return after that. AR 445-46.

3. <u>Dr. Stacy Blackburn</u>

On April 13, 2015, three days before plaintiff met with a therapist to work out an exercise program, she told her family physician, Dr. Blackburn, that she was unable to exercise and asked the doctor to give her a disability parking pass, which the doctor did. AR 383-84. She also said she had not started any medications or any treatment plan. The doctor started her on Cymbalta, which improved her energy level. AR 383. The doctor increased the dosage the next month. AR 382. In June and July 2015, plaintiff reported increased energy, but no less pain. AR 381.

Plaintiff saw Dr. Blackburn in January 2016 for a physical examination and reported that she was not getting as much relief from Effexor as she would like, but was not interested in starting any other medication or having any counseling. AR 463. She said she was using shoe inserts and had also started using a cane. <u>Id</u>. The doctor prescribed Flexeril for fibromyalgia and Venlafaxine for fibromyalgia and anxiety. <u>Id</u>.

In December 2017, plaintiff saw Dr. Blackburn for refills of her medication, saying that she had been out of medications for a period of five months because of insurance problems. AR 455. She complained of increased pain all over, as well as increased anxiety and depression. <u>Id</u>. She said she was working 20 hours a week and finding that doing so made it difficult for her to do anything else. <u>Id</u>.

On February 9, 2018, Dr. Blackburn wrote a letter "to whom it may concern," saying that she had been plaintiff's primary care provider since 2013 and it was her opinion that it was physically necessary for plaintiff to limit her work week to 22 hours or less. AR 449.

5

She added that plaintiff's ability to stand was limited to 30 minutes or less at a time and that plaintiff "sometimes walks with the assistance of a cane and even uses a wheelchair as needed." Id. The doctor listed plaintiff's medical problems as her congenital foot deformity with two prior surgeries, Charcot-Marie-Tooth and fibromyalgia. She also said that plaintiff might suffer flare-ups that last up to a few days and would require absences from work. Id.

4. Dr. Timothy Buckley

Plaintiff saw Dr. Timothy Buckley, an internist, in June 2016, on referral from Dr. Blackburn. AR 472. Plaintiff complained of hurting all over in her muscles and joints, especially in her legs, back and feet, but denied having any joint swelling. Id. She said that she was taking cyclobenzaprine, which helped with her joint pain but made her drowsy during the daytime. Dr. Buckley found normal range of motion of her joints and good strength in all her major muscle groups. He agreed that she suffered from fibromyalgia, and he told her that, with fibromyalgia, the "[m]ost important thing is to be active in low-impact aerobic program as well as some strength training and flexibility exercises." Id. He suggested that plaintiff cut back on her cyclobenzaprine during the daytime to see whether that would help her pain and yet not make her so drowsy. Id.

C. State Agency Reviewers

Pat Chan, M.D., reviewed plaintiff's medical records and concluded that, although plaintiff had the severe impairments of peripheral neuropathy, fibromyalgia and chronic

6

fatigue syndrome, she did not meet or equal any listing level impairments. AR 86. He concluded that plaintiff had the residual functional capacity to perform sedentary work. As part of the review, Jack Spear, Ph.D., assessed plaintiff's mental health and concluded that she had no severe mental health impairment. AR 86. Dr. Chan concluded that although plaintiff had exertional limitations, she could lift and carry ten pounds occasionally, lift or carry less than ten pounds frequently, stand or walk with normal breaks for a total of two hours, sit with normal breaks for about six hours out of an eight-hour workday and had unlimited ability to push or pull, other than the limitations set out for lifting or carrying. AR 89.

George Walcott, M.D., reviewed plaintiff's medical record at the reconsideration level. AR 93. In response to a question about any change in her physical condition, plaintiff wrote that she had started walking with a cane. AR 94. Dr. Walcott wrote that plaintiff had reported being unable to undertake most activities of daily living, because of her fatigue, although she did manage daily self-care. AR 95. Dr. Walcott noted that plaintiff's physical examinations were stable overall, her heart rate was regular and her lungs were clear, AR 97, and she was on medication for mild depression and anxiety, but was doing well. AR 98. Dr. Walcott assessed plaintiff's peripheral neuropathy as her primary impairment, along with other arthopathies (joint diseases), fibromyalgia and chronic fatigue syndrome. Id. He gave plaintiff the same exertional limitations as Dr. Chan had assessed in his review. AR 97-98.

Stacy Fiore, Phy.D., reviewed plaintiff for mental impairments and concluded that she had only mild anxiety or depression. Plaintiff said she was not interested in psychiatric

counseling. AR 99.

D. Administrative Hearing

1. Plaintiff's testimony

Plaintiff had a video conference hearing before an administrative law judge on January 28, 2018. Plaintiff testified that she had a high school education with no degrees or certifications after high school. She had worked at Caribou Coffee from 2008 until 2012, as a coffee server, or barista, taking customer orders, making drinks, cleaning the coffee shop area, ordering stock, putting it away when it arrived and inventorying it regularly. In her last two years at Caribou, she was a supervisor, which involved training other employees. AR 45-47. During her time at Caribou, she lifted 30 to 50 pounds at a time, was primarily on her feet and supervised three to four people at any given time. Id.

Plaintiff's job at Caribou ended when she married and moved away. AR 48. She then took a job at Associated Bank as a teller, where she had to stand during her shifts and sometimes had to lift coin bags weighing 30 to 50 pounds. Id. She started as a "flex employee," but then became part-time. AR 49. She testified at her hearing that she was working two to four hours a day, for a total of 20 hours a week. AR 50.

Plaintiff testified that she lives in a two-story house, but spends most of her time on the first floor, because she has difficulty climbing stairs. AR 54. Her husband does most of the work around the house, including cleaning, housework, shopping and cooking meals, because her fibromyalgia causes her pain on a regular basis and her foot problems cause her

8

extreme pain if she has to be on her feet for any length of time.  AR 55.  In addition, moving, stretching too much or trying to lift things can increase her pain level.  Id.  She said that she experienced pain throughout her entire body, including her spine, her stomach, shoulders, chest, elbows, wrists, ankles, toes and head,  AR 55-56, and her inability to take care of her house and be with her friends provokes feelings in her of hopelessness and anxiety.  AR 58.

In response to questioning by her counsel, plaintiff said that she had been using a cane for a year and a half to two years, and that she needed it because she could lose her balance at any time.  AR 61.  She also said that she used a wheelchair at times when anticipating long distances, that is, more than six blocks.  AR 61-62.  Neither the cane nor the wheelchair was prescribed by a doctor.  AR 70.  Plaintiff said that she used the electric carts in the grocery store when she shopped for groceries, because she can stand for only 30 to 40 minutes on a good day and only 10 minutes on other days.  AR 62.  When plaintiff is at work, she can sit down and her co-workers will often obtain the things she needs if she does not have them at her desk.  AR 63.

Plaintiff testified that she had chronic fatigue syndrome and was often exhausted and in need of long hours of sleep.  AR 65.  When she is in severe pain, she often has difficulty staying focused or maintaining concentration.  Id.  She added that she was not seeing a rheumatologist for her fibromyalgia, only her general practitioner, and that the only treatment the doctor was giving her was cyclobenzaprine.  AR 67.  Her last visit to a doctor had been within the previous month and was for a regular checkup.  AR 71.

Plaintiff said that her Charcot-Marie-Tooth disease has caused deformation of her feet

9

and ankles so that she can lose her balance and fall at any time. AR 60. As a consequence, she has to be "really careful how much I'm on my feet." Id. She had surgery on her right foot as a child and she broke the same foot again in 2013. Id.

In addition to her work at the bank, plaintiff spends time working as a "consultant" on jewelry sales, through Facebook or "vendor events," such as winter craft sales, and that she handles this work with the help of her husband and another consultant. AR 68. Plaintiff has a driver's license with no restrictions, except for the wearing of glasses, and she drives almost daily. AR 69-70.

On weekends, plaintiff and her husband travel two to two-and-one-half hours on a regular basis to visit his mother and help her out. AR 71.

2. Vocational expert

Vocational expert, Lanell Hall described plaintiff's job as a teller as being light, SVP 5, skilled, but performed at the medium exertional level. AR 74. (SVP is short for Specific Vocational Preparation; in this context "light" refers to the time required to prepare for a specific type of job.) The job as a coffee shop attendant was light, in terms of job preparation (SVP 2), and unskilled, but is performed at the medium exertion level. As a supervisor doing additional clerical work at the coffee shop, plaintiff's job was light, SVP 4, semi-skilled and performed at the medium exertion level. Id.

Hall testified that plaintiff would not be able to perform any of her past work. In reaching this conclusion, she took into consideration an individual who was 29 years old,

had a high school education and had worked as a barista and bank teller, and had the capacity for sedentary work, with no work around hazards such as unprotected heights, open flames or dangerous moving machinery; no climbing of ladders, ropes or scaffolds; occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching and crawling, AR 75. She testified that a person with such restrictions could perform sedentary jobs, even those limited to simple/routine tasks, with not more than frequent handling and fingering with both hands. Id. These jobs would include order clerk, document preparer, touch-up screener; all would be SVP 2. For each of these positions, there are between 26,000 and 47,000 jobs. Id. The numbers would not change for an employee who needed an assistive device for walking on the job. AR 76. The employer tolerance for absenteeism would be no more than one day per month or more than eight days a year. Id.

3. Administrative law judge's decision

The administrative law judge found that plaintiff had the severe impairments of fibromyalgia, chronic fatigue syndrome, Charcot-Marie-Tooth disease, obesity and bilateral cavorarus foot deformity, as well as right foot surgeries, and these impairments significantly limited her ability to perform basic work activities. In addition, plaintiff had hypothyroidism controlled with medication, which was rated as non-severe, and she also had eczema, which was also rated as non-severe because it was treated with topical creams. She has medically determinable mental impairments of anxiety and depression but these too were non-severe because they did not cause more than minimal limitation of her ability to

11

perform basic mental work activities.  In fact, plaintiff had declined psychiatry and counseling for these problems.   AR 20.

Reviewing the four areas of mental impairments, the administrative law judge concluded that plaintiff had no limitation in three of the four (understanding, remembering or applying information; interacting with others; and adapting or managing oneself), and that she had only a mild limitation in a fourth area, concentrating, persisting and maintaining pace.  AR 21.  The administrative law judge attributed any limitations in this area to plaintiff's pain and the symptoms caused by her severe impairments, because she was able to handle her semi-skilled position at the bank, enjoyed watching television, knitting and cross-stitching, read, played games and acted as a sign language interpreter at her church. Id.

It was the administrative law judge conclusion that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpt. P, App. 1, 20  C.F.R. § 404.1520(d), § 404.1525 and § 404.1526.  Although plaintiff had medically determinable impairments that could reasonably be expected to cause the symptoms she alleged, the administrative law judge did not find her statements about the intensity, persistence and limiting effects of those symptoms entirely consistent with either the medical evidence or the other evidence in the record.  AR 22.

Plaintiff had a long history of club foot, but the administrative law judge took into consideration the number of years plaintiff had worked, despite that problem.  Although

plaintiff had a stress fracture that was diagnosed in October 2013, she stabilized soon afterwards, using either a Cam boot or a knee roller that allowed her to rest her knee or foot on the cart. Within three months, she was able to walk without assistance and was no longer wearing the Cam boot. AR 23, citing AR 324. When she saw her podiatrist in January 2014, she was no longer complaining of pain and was walking without using the Cam boot. Id., citing AR 323. In May 2014, she told her podiatrist that she was having good results with wearing a right orthotic shoe insert, but not when she wore the insert in her left shoe. Id., citing AR 323. She also said that when she worked as a bank teller, she experienced edema at the end of the day. Id.

The administrative law judge also considered plaintiff's visits to the Mayo Clinic, on Dr. Sullivan's referral. At one of these visits, on June 10, 2014, Dr. Daniel Rossman observed that plaintiff had pain in both feet, right worse than left, and weakness. She found it painful to wear her orthotics, but she described her sensation as intact. AR 372-73.

With respect to plaintiff's Charcot-Marie-Tooth problems, the administrative law judge observed that plaintiff was not experiencing falls or decreased sensation, and that she also had a diagnosis of fibromyalgia. AR 24. She had had a fibromyalgia and chronic fatigue syndrome work-up at the Mayo Clinic, but had not followed through on the treatment recommended for these conditions. AR 24.

Following the five-step sequential evaluation process, the administrative law judge found at step one that plaintiff had engaged in substantial gainful activity. (The Appeals Council overruled this aspect of the administrative law judge's decision, finding that plaintiff

had not engaged in substantial gainful activity since her alleged onset date, October 1, 2013, but that decision does not affect the final disposition of plaintiff's claim.) At step two, the administrative law judge found that plaintiff had the severe impairments of fibromyalgia, chronic fatigue syndrome, Charcot-Marie-Tooth disease, obesity and bilateral cavovarus foot deformity, status post right foot surgeries. AR 20. At step three, she determined that whether plaintiff's impairments were considered separately or individually, they did not meet or medically equal the severity of one or more listed impairments.

The administrative law judge concluded that plaintiff had the residual functional capacity for sedentary work, with no work around hazards such as unprotected heights, open flames or dangerous moving machinery; no climbing of ladders, ropes or scaffolds; occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching and crawling; no work around unprotected heights, open flames or dangerous moving machinery. At step four, she agreed with the state agency consultants that plaintiff lacked the residual functional capacity to perform the requirements of her past relevant work.

Finally, at step five, the administrative law judge determined that, despite plaintiff's inability to perform any past relevant work, jobs existed in significant numbers in the national economy that she could perform, considering her age, education, work experience and residual functional capacity. As the vocational expert had testified, these included order clerk, document preparer and touch up screener. In assessing plaintiff's ability to work, the administrative law judge did not consider plaintiff's fibromyalgia because plaintiff had chosen not to follow the recommendations for treatment and she had told Dr. Robert Key, a

physician, that she was taking a muscle relaxer for her fibromyalgia. In addition, the administrative law judge gave little weight to plaintiff's complaints of foot problems because plaintiff had had no recent treatment for her feet. In fact, she had not seen a podiatrist since 2014 and she had not complained of foot pain to her family doctor since then.

OPINION

Plaintiff contends that the administrative law judge's decision is erroneous in three respects: (1) in failing to give sufficient weight to the opinion of Dr. Blackburn, who was plaintiff's treating physician; (2) in adopting the administrative law judge's flawed credibility findings; and (3) in failing to properly assess medical listing 1.02A.

A. Weighing Dr. Blackburn's Opinion

The administrative law judge had adequate reason not to give controlling governing weight to Dr. Blackburn's opinion that plaintiff was incapable of working more than 22 hours a week. Under the regulations in effect at the time, a medical opinion such as Dr. Blackburn's was entitled to controlling weight only if three conditions were met: first, the opinion was rendered by a treating source; second, it was well supported by medically acceptable clinical and laboratory diagnostics; and third, it was not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2).

Although Dr. Blackburn's opinion was rendered by a treating source and thus met the first condition, it failed the next two because it was neither well supported by medically

15

acceptable diagnostics nor consistent with other substantial evidence. For example, Dr. Blackburn stated that plaintiff needed a wheelchair at times although the record does not disclose that she ever used one except when she was at the Mayo Clinic in Rochester, where the circumstances and distances made such use practical. As for the canes plaintiff needed in January 2016, this might have been true at that time, when she thought she had sprained her ankle, but there is no evidence that she needed one after her ankle healed. Even if she did, needing a cane would not necessarily have precluded her from all work, given her restriction to sedentary work. Plaintiff's rare use of a wheelchair and her occasional resort to a cane do not meet the requirement that such use be well supported by acceptable clinical and laboratory diagnostics.

Finally, there is no showing that Dr. Blackburn's opinion was consistent with other evidence in the record. Although she wrote in her letter "to whom it may concern" that plaintiff used a wheelchair at times, Dr. Blackburn had no independent knowledge that this was the case.

As a general rule, an opinion from a treating physician such as Dr. Blackburn is to be given more weight than one from a non-treating or non-examining physician. Gudgel v. Barnhart, 345 F.3d 467, 470 (7th Cir. 2003) ("A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record. See 20 C.F.R. § 404.1527(d)(2)." However, the general rule does not apply in this case because it is evident from a review of the evidence that Dr. Blackburn did not have first-

16

hand knowledge about plaintiff's need for a wheelchair on a regular basis, her opinion was not supported by medical findings and it is not consistent with other evidence in the record.

The administrative law judge noted that plaintiff had been non-compliant with treatment recommendations from the doctors she saw at the Mayo Clinic for her feet and from Dr. Buckley, her internist, who emphasized the importance of engaging in exercise to ease her fibromyalgia and chronic fatigue syndrome. Despite their recommendations, the only known exercise plaintiff engaged in were the four sessions of low impact water aerobic exercises she took before quitting altogether.

Plaintiff objects to the court's drawing any conclusions from her failure to exercise in light of the administrative law judge's failure to inquire into the reasons for her noncompliance with treatment. She cites the applicable provision, SSR 16-3p, 2017 WL 5180304 *9-10 (Oct. 25, 2017), which provides that the agency "will consider and address reasons for not pursuing treatment that are pertinent to an individual's case." She contends that the court cannot assume that her condition would have improved had she followed her doctors' advice and points out that the administrative law judge did not take into account the possibility that plaintiff's obesity and chronic fatigue syndrome would have made the exercise too difficult for her. These arguments are not persuasive. Dr. Blackburn did not discuss plaintiff's failure to exercise, so her opinion on the subject is unknown. What is known is that the doctors who evaluated plaintiff at the Mayo Clinic emphasized to her the importance of exercise, as did Dr. Buckley.

17

B. <u>Administrative Law Judge's Evaluation of Plaintiff's Credibility</u>

The administrative law judge was not persuaded that plaintiff's statements about the intensity, persistence and limiting effects of her symptoms were accurate and explained her reasons. First, after plaintiff's treatment at the Mayo Clinic for a stress fracture in 2013 and early 2014, plaintiff exhibited significant improvement in her foot pain. At that time, she had independent ambulation and normal range of motion. Second, the pain from plaintiff's fibromyalgia and chronic fatigue syndrome lessened after Dr. Blackburn began prescribing medication for her. (Plaintiff's suggestion that her pain cannot be considered "treated" because her doctor adjusted the medications and dosages from time to time has no support in the record.) Third, plaintiff's failure to follow her doctors' recommendations for exercise draws into question her actual interest in improving her health and her ability to walk longer distances. It may be that plaintiff could not afford the exercise, but she did not raise that as a problem with any of the doctors who suggested it. It would have been helpful for the administrative law judge to have questioned plaintiff specifically on this point, but her failure to do so does not mean that plaintiff is entitled to a decision in her favor. The administrative law judge's findings on this issue were supported by substantial evidence and explained in a way that allows a determination of how she reached her decision. <u>McKinzey v. Astrue</u>, 641 F.3d 884, 890 (7th Cir. 2011) ("ALJ must explain her decision in such a way that allows [reviewing court] to determine whether she reached her decision in a rational wmanner, logically based on her specific findings and the evidence in the record.") <u>See</u> <u>also</u> <u>Skarbek v. Barnhart</u>, 390 F.3d 500, 505 (7th Cir. 2004).

Fourth, plaintiff's asserted need for a wheelchair is not supported by her use of one at the Mayo Clinic. No medical source has suggested that she needed one at any other time or place. Fifth, although plaintiff says that no consideration has been given to her chronic fatigue syndrome, in fact, the administrative law judge assessed a very restrictive residual functional capacity for her and plaintiff has not explained why such an RFC did not accommodate her physical limitations.

## C. Failure to Properly Assess Medical Listing 1.02A

Plaintiff challenges the administrative law judge's finding that her impairments did not meet or equal listing 1.02A, which addresses major dysfunction of a joint. To qualify, she would need evidence of a gross anatomical deformity, such as contracture, bony or fibrous ankylosis, plus chronic joint pain, plus stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), plus findings on appropriate medically acceptable imaging of joint space, narrowing, bony destruction, or ankylosis of the affected joint(s) and involvement of one major peripheral weight-bearing joint (i.e., hip, knee or ankle), resulting in inability to ambulate effectively, as defined in 10 C.F.R. Pt. 404, Subpt P, App 1 § 1.00B2b.

It is plaintiff's burden to show that any one or more of her impairments meet all the requirements of the listing. Filus v. Astrue, 694 F.3d 863, 868 (7th Cir. 2012) (plaintiff could not satisfy the requirements of a specific listing, as shown by his own testimony). Meeting only some requirements is not enough to qualify. Although plaintiff has evidence of foot

problems, she has no evidence from an acceptable medical source that these problems qualify for a listing or its equivalent. Indeed, the only evidence she has on this point is to the contrary and comes from the reports of the state agency doctors, Dr. Chan and Dr. Walcott, both of whom concluded that plaintiff's impairment *did not meet or equal* a listing. AR 86, 101. As noted earlier, both doctors concluded that plaintiff was capable of performing sedentary work, given her age, education and residual functional capacity. Id.

I conclude that the administrative law judge gave adequate reasons for her decision in this case. Therefore, I will affirm the commissioner's decision to deny benefits to plaintiff.

ORDER

IT IS ORDERED that the decision of Andrew Saul, Commissioner of Social Security, is AFFIRMED and plaintiff Beth A. Bekeleski's appeal is DISMISSED. The clerk of court is directed to enter judgment in favor of defendant and close this case.

Entered this 21st day of February, 2020.

BY THE COURT:

/s/
_____
BARBARA B. CRABB
District Judge